Upland Borough,               :
             Petitioner    :
       v.           :
                       :
Unemployment Compensation   :
Board of Review,           :   No. 1548 C.D. 2016
            Respondent  :   Submitted: February 24, 2017

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE JOSEPH M. COSGROVE, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                  FILED: June 12, 2017

Upland Borough (Borough/Employer) petitions this Court for review of the Unemployment Compensation (UC) Board of Review's (UCBR) August 19, 2016 order affirming the Referee's decision granting Nelson Ocasio (Claimant) UC benefits under Section 402(e) of the UC Law (Law).[1]  The sole issue before the Court is whether the UCBR's findings of fact are supported by substantial evidence.  After review, we affirm.

Claimant was employed full-time as Employer's Police Chief from July 5, 2010 through February 22, 2016.  On February 17, 2016, Claimant was issued a performance review (Performance Review), and was cited for failing to conduct an investigation into missing vehicle camera systems, forcing Council Member Dan Smith (Smith) to resign, exceeding the 2015 payroll budget, issuing unexplained administrative pay for an officer, making questionable personal recommendations to

---

[1] Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e) (referring to willful misconduct).

Borough Council (Council) to hire two part-time officers, authorizing a third-party police department evaluation report allegedly without authorization, and failing to account for funds raised for a juvenile crime victim. On February 22, 2016, Claimant ordered a lockdown of the police department premises, as there was an ongoing investigation into alleged fraud by Council Member Christine Peterson (Peterson). Peterson was arrested. Borough Mayor Michael Ciach (Mayor) unsuccessfully attempted to enter the building. Claimant and the Mayor had words, during which Claimant repeatedly told the Mayor to get out of his face. The Mayor suspended Claimant pending discharge for insubordination, as well as the issues raised in the February 17, 2016 Performance Review.[2]

Claimant applied for UC benefits. On April 25, 2016, the Lancaster UC Service Center found Claimant eligible for UC benefits under Section 402(e) of the Law. Employer appealed, and Referee hearings were held. On June 30, 2016, the Referee affirmed the UC Service Center's determination. Employer appealed to the UCBR. On August 19, 2016, the UCBR affirmed the Referee's decision. Employer appealed to this Court.[3]

Employer argues that the UCBR's findings of fact are not supported by substantial evidence.[4] We disagree.

---

[2] On February 23, 2016, Borough Council voted to suspend Claimant with intent to terminate his employment pending an investigation. On February 24, 2016, Employer sent Claimant a letter advising him that he was suspended without pay with intent to terminate his employment pending an ongoing investigation. Claimant's employment status remained the same when the record closed.

[3] "Our scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings of fact were unsupported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704." *Turgeon v. Unemployment Comp. Bd. of Review*, 64 A.3d 729, 731 n.3 (Pa. Cmwlth. 2013).

[4] Employer does not reference any findings of fact by number, but rather its argument pertains to four specific incidents. Thus, we will address the findings of fact regarding those alleged occurrences.

The law is well established that:

> [T]he [UCBR] is the ultimate fact-finder in [UC] matters and is empowered to resolve all conflicts in evidence, witness credibility, and weight accorded the evidence. **It is irrelevant whether the record contains evidence to support findings other than those made by the fact-finder; the critical inquiry is whether there is evidence to support the findings actually made.** Where substantial evidence supports the [UCBR's] findings, they are conclusive on appeal.

*Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Review*, 949 A.2d 338, 342 (Pa. Cmwlth. 2008) (citations omitted; emphasis added). This Court has explained:

> Substantial evidence is relevant evidence upon which a reasonable mind could base a conclusion. In deciding whether there is substantial evidence to support the [UCBR's] findings, this Court must examine the testimony in the light most favorable to the prevailing party, giving that party the benefit of any inferences which can logically and reasonably be drawn from the evidence.

*Sanders v. Unemployment Comp. Bd. of Review*, 739 A.2d 616, 618 (Pa. Cmwlth. 1999).

Essentially, Employer argues that it presented sufficient evidence to support its claims. However, the issue is not what evidence Employer presented but rather whether substantial evidence supports the UCBR's findings. *Ductmate Indus., Inc.* With respect to the alleged willful misconduct based on Claimant's forcing Smith to resign from Council, the UCBR found: "[C]laimant told [Smith] that it would be in his best interest to resign because [Smith] was accused of brandishing a weapon during a fire call.[5] [Smith] chose to resign, [C]laimant did not coerce [Smith] to resign." UCBR Dec. at 2, Finding of Fact (FOF) 7.

---

[5] In addition to being a Council Member, Smith is also the Borough's Fire Chief.

3

Smith testified:

EW1 [Smith] [Claimant] called me during the day and asked me if I was able to stop in his office later in the day to talk to me. I told him yes and he told me that -- to wait for him to text me. He didn't want anybody else in the office, that he just wanted to talk to me. I said that's fine. I got the text. I went over to his office. He led me to his office. I sat down. He asked me to hang my coat up, asked me if I was carrying my weapon, at which point, I stated no, I wasn't. Asked me if my phone was on, if I was recording or anything like that. I stated no. It became a comfortable meeting. He was taking off his uniform at the time, took off his shirt, took off his vest, sat down at his desk. I was across from him. He stated to me that he wanted to know what had happened on a fire call at 900 Main Street, Northwest Human Services. We had gone there for a fire alarm. I told him exactly what happened at the fire alarm. He stated to me, so at no time, you threatened to use your gun or to pull your gun on any of the residents or the orderlies that are working there. I said no, not at all. I never threatened to pull my gun or even pulled my gun. I was asked if I had [my] gun with me. I said yes, it was in a car, it wasn't even on my person at the time. He had told me that he could have criminal charges pressed against me because they had an issue saying that I wanted to use my gun or that I was pulling my gun on the orderly up there, that [sic] he kept tapping on a manila folder that was on his desk and it was a whole bunch of paperwork to [sic] the manila folder saying that he had all the paperwork drawn up and all the witnesses' paperwork with witnesses stating that this went on, that this occurred up there. I told him no, that it never happened, it didn't happen. **I did tell him that at one point, one of the residents did come out after me. We did find out -- I didn't know what he had in his hands. He had a box and he had a whole bunch of stuff. He started to approach me, a resident. They are mentally handicapped residents. I told the orderly to get him back. After they wind up securing the resident, the orderly did say to me that that specific resident has a problem with firefighters because apparently the last place he was at, a firefighter took something from his room or whatever, so he did have an issue with [inaudible] at that point, I did tell the orderly that he's**

**supposed to have these people under control and that he had stuff in his hands that I did not know what it was and that, at any time, if my life was threatened, that I do carry a gun. Never did I produce it.**

EL [Employer's Attorney] Okay. On that date, you didn't produce your weapon?

EW1 **I did not produce it, I did not show it. It was just implemented** [sic] **that I do carry**.

EL On January 22nd, 2015, after you explained that to [Claimant], what you just explained to the Referee, what happened next?

EW1 **He told me that they wanted answers, that they wanted some type of charges brought against me, that I would either have to resign my position as Fire Chief or resign my position on [C]ouncil because that would be one of the best things to do, to give them something. I told him, I said I wanted to think about it. He told me I had to have an answer that day. And I said okay, well, I guess I'll resign from [C]ouncil because I've been a firefighter for 26 years. I was on [C]ouncil for a little bit of time. I said I'll resign from [C]ouncil, I kind of want it** [sic] **off anyway**. . . .

Reproduced Record (R.R.) at 9a-10a (emphasis added). The UCBR "is free to accept or reject the testimony of any witness in whole or in part." *McFadden v. Unemployment Comp. Bd. of Review,* 806 A.2d 955, 958 (Pa. Cmwlth. 2002). Reviewing the above testimony "in the light most favorable to [Claimant]," as we must because Claimant was the prevailing party below, and "giving [Claimant] the benefit of any inference that can logically and reasonably be drawn from the evidence," we hold that Smith's testimony is substantial evidence and supports FOF 7. *Sanders*, 739 A.2d at 618.

Relative to Claimant's alleged willful misconduct based on his failure to investigate Employer's missing cameras, the UCBR found: "[C]laimant did not conduct an investigation regarding the missing cameras because he was not ordered

5

to do so by [C]ouncil when they opted not to order an investigation or take further actions." UCBR Dec. at 2, FOF 10.

Former Council President, current Council Member Edward Mitchell (Mitchell) testified:

> CL [Claimant's Attorney] . . . . Were you aware of a June 2015 incident regarding a missing camera system?
>
> . . . .
>
> CW1 [Mitchell] Yes.
>
> CL Okay. And how were you aware of this issue?
>
> CW1 We had a disgruntled employee who was probably fired because he had drugs, everything on his truck. He was a maintenance man with (inaudible). [Claimant] saw him going down the street the wrong way. Called a meeting to see if we could bring him in to see what was wrong with him and (inaudible) had him taken for a blood test and they said he was hot. The term they made that he was hot [sic] and we started taking an inventory of everything that was missing and by God, it was missing. But going with the cameras, we had the building open. We had one of the largest raids in the Chester/Upland area with every criminal division within the [f]ederal [g]overnment, everybody was in that building where all these cameras and everything would have been, so anybody, we had the mummers in there. We had the building -- we let everybody use the building because it wasn't being used for anything except for putting fire alarms [sic] and putting the place together. It was only after this one employee got fired we found out that God, everything is missing. You know, a lot of stuff is missing. To put a dollar figure on it . . . [.]
>
> CL Well let me ask you this. **Were you ever as a [C]ouncilperson, did you ever raise a concern that [Claimant] was not moving forward with a proper investigation regarding that?**
>
> CW1 **No.** . . .
>
> CL Did you actually convene at a [C]ouncil meeting regarding that issue?

6

CW1 What, about missing stuff?

CL Yes.

CW1 We had a couple meetings with the personnel committee on disposition of the employee, but it wasn't a regular Council meeting.  We had a Council meeting for firing him.  We accepted his resignation.

CL **But did you remember if there was any -- if I, if I understand your testimony, it's your understanding that the issue was that there would have been no way to find out who would have stolen this?**

CW1 **Yes**.  And, and . . . [.]

. . . .

CL . . . .  [W]hat was the actual issue that was raised and what was talked about[?]

CW1 The serious issue was how are you going to blame one guy?  **You can't get [Claimant] to have an investigation when the building was open carte blanche to the public.**

CL And was the Mayor present for that, that meeting if you recall?

CW1 No I don't think so.

CL All right.  Was the entire Council present for that?

CW1 No.  It's probably more the personnel committee.

CL Personnel committee?

CW1 Yes.

CL All right.  And was there anybody from the personnel committee that relayed this issue about the cameras and the possible inability to find a suspect to either the Mayor or the other Council people?

CW1 Well, the Vice President of Council is secondary to the police department so it could be very, very well.

7

CL All right. And was this an official meeting in which minutes was recorded?

CW1 Personnel committee, the Borough Manager, our Solicitor. I think that was about it.

CL Okay.

CW1 And [Claimant] was there.

R.R. at 92a-94a (emphasis added). Reviewing this testimony "in the light most favorable to [Claimant]," as we must, and "giving [Claimant] the benefit of any inference that can logically and reasonably be drawn from the evidence," we hold that Mitchell's testimony is substantial evidence and supports FOF 10. *Sanders*, 739 A.2d at 618.

Concerning the alleged willful misconduct based on Claimant's filing charges against Peterson, Employer asserts:

> [Employer] presented substantial evidence of [Claimant's] willful misconduct with regards to filing criminal charges against [] Peterson. When [Claimant] arrested [] Peterson, he acted with disregard towards the standards of behavior which [Employer] rightfully expected of him. After his performance meeting on February 18, 2016, and with full knowledge that [the] Mayor [] intended to recommend [Claimant's] demotion at a meeting with Council on either February 22, 2016 or February 23, 2016, [**Claimant**] removed [Borough] time cards from the Borough Hall, and **fabricated criminal charges against** [] **Peterson** who was also the President of Council. The criminal charges against [] Peterson were withdrawn by the Delaware County District Attorney's Office.

Employer Br. at 13 (emphasis added). The above quote is the entirety of Employer's argument on this issue. Employer does not reference any record evidence supporting this claim.[6] Further, the UCBR did not make any specific findings of fact regarding this allegation. The UCBR however, concluded: "There were a number of allegations

---

[6] Employer did not include references to the record in any of its arguments.

8

made against [C]laimant by [E]mployer. Those allegations are unproven, or were credibly explained by [C]laimant's witnesses." UCBR Dec. at 3. After a thorough review of the record, we discern no error in the UCBR's conclusion regarding this allegation.

> Lastly, Employer contends:
>
> In addition to filing fabricated criminal charges, [Claimant] escalated his wanton or willful disregard for [Employer's] interest, and acted with disregard towards the standards of behavior which [Employer] rightfully expected of him when he ordered the locked down the police station [sic] and threatened to arrest [the] Mayor []. Even after [the] Mayor [] suspended [Claimant] for verbal altercation, [Claimant] ignored the suspension and ordered Officer Michael Irey [(Irey)] into [Claimant's] office. [Employer] presented substantial evidence of [Claimant's] willful misconduct with regard[] to his insubordination directed toward [the] Mayor [].

Employer Br. at 13. The UCBR's findings of fact relative to this claim are as follows:

> 3. On February 22, 2016, [C]laimant ordered a lockdown of the police department premises, as there was an ongoing investigation into alleged fraud by a member of [B]orough [C]ouncil. That councilperson was arrested.
>
> 4. The [] [M]ayor unsuccessfully attempted to enter the building.
>
> 5. [C]laimant and the [M]ayor had words, with [C]laimant telling the [M]ayor to get out of his face.
>
> 6. The [M]ayor then suspended [C]laimant pending discharge for alleged insubordination, as well as the issues raised in the . . . February 17, 2016 [Performance Review].

UCBR Dec. at 2.

> With regard to this allegation, the Mayor related:
>
> R[eferee]  Well, you can tell me what you witnessed [on February 22, 2016].

9

EW6 [the Mayor] I pulled up into the parking lot and saw the Pennsylvania State Police car and [Claimant] and [Borough police officer] Shawn Dougherty [(Dougherty)] pulling out of the station, taking [] Peterson out of the parking lot after being arrested.

EL [Employer's Attorney] Okay. And did [Claimant] subsequently return on February 22nd, 2016?

EW6 He did.

. . . .

EL Did there come a point in time when you learned that you were locked out of the building?

EW6 Yes.

EL What time was that, if you recall?

EW6 I received a phone call that Tom Willard [(Willard)], who is from Logan Technology, the owner of Logan Technology was in the building and was locking out myself and several members of [C]ouncil from the building. I was at my home residence at the time. I came back to the building and [Willard], at that point, was at [Peterson's] computer station with the open security system opened, removing individuals at that point from the security system, including myself. I -- initially, when I got there, I waved my fob and couldn't enter the building. [Borough police officer] Anthony Deluise [(Deluise)] came to the front door and opened the door for me so I could come in. As I came in the door, I looked in to my left where [Peterson's] office is through the security window. I saw [Willard] in there. I said [Willard], what are you doing in there. He said [Claimant] asked me to remove some people from the security system. I said stop what you're doing now and leave this building. And he removed himself and then, before he removed himself, I said wait a minute, go back in there and enter me back into the building so I -- back into the system so that I can get back into the system -- or get back into the building. He went in, entered me back into the building. He shut down the computer and he walked out and he left the building.

10

EL Did [Claimant] subsequently return from the time that he had left?

EW6 He did.

EL Okay. When he returned, please explain the encounter between you and [Claimant].

EW6 When [Claimant] and [] Dougherty walked in the building, I had been standing to -- which would have been as they entered the building, to their right with three other -- or two -- three other officers; [] Deluise, Officer Van Horn [(Van Horn)] and [] Irey to the back of the -- to the backside of the building. **I looked at [Claimant] as he came in the door and I said [Claimant], I need to ask you a question, did you try to have us locked out of the building. He refused to answer me. He said [Mayor], you have five seconds to get out of my face I said [Claimant], I'm asking you again, did you try to lock us out of the building and he says [sic] [Mayor], you have five seconds to get out of my face or I'll lock you up, you're trying to infect an arrest. At that point, Irey said you're going to arrest me. He said no. I said then you're suspended right now, put your gun and badge down. He walked right past me and then walked down, turned around and looked at Irey and says [sic] I want -- I need to talk to you in my office. And that's when he, [] Irey and [] Dougherty, being the [Union] representative, walked into the office. The two other officers, [] Deluise and [] Van Horn kind of gestured me back towards behind the wall.**

R.R. at 36a-38a (emphasis added).

On cross-examination, the Mayor further explained:

CL [Claimant's Attorney] When did you suspend [Claimant]?

EW2 [the Mayor] The 22nd.

. . . .

CL In February 2016. When did you suspend him?

EW2 It was approximately 11:00 that morning.

11

CL 11:00 that morning.

R[eferee] And why did you suspend him?

EW2 I suspended him because he originally came back and there was an occurrence that was going on prior to that, but he had locked us out of the building. Myself, [] Irey and several other [C]ouncil [M]embers out of the police building. I questioned him about that . . . [.]

R Was it just you guys [sic] that you named that he locked out or was it locked in general?

EW2 I'm sorry. I misunderstood. . . [.]

R You said he locked you and you named other people.

EW2 Yes.

R Was the building shut down in general or was it just . . [.]

EW2 No.

R . . . specific people was [sic] locked out?

EW2 Just specific people were locked out of the building.

R Okay.

CL **And those specific people were actually the focus, some of them were the focus of this investigation including [] Irey and . . . Peterson, correct?**

EW2 **Okay. Yes** and when I questioned him why he . . . [.]

CL Just answer my question.

R Limit your response to the question.

EW2 Well, they were two of the individuals that were locked out.

CL Right. And before 11 a.m. . . [.]

EW2 Um-hum.

CL . . . **you never asked him about his investigation regarding [] Peterson or [] Irey**?

12

EW2 **Before that time he never brought that investigation to me either being his direct superior.**

CL **Well did you ask to see it before you suspended him?**

EW2 **No**.

R.R. at 67a-68a (emphasis added).

Because the UCBR "is free to accept or reject the testimony of any witness in whole or in part," *McFadden,* 806 A.2d at 958, and we must review this testimony "in the light most favorable to [Claimant]," and "giv[e] [Claimant] the benefit of any inference that can logically and reasonably be drawn from the evidence," we hold that the Mayor's testimony is substantial evidence and supports FOFs 3, 4, 5 and 6. *Sanders*, 739 A.2d at 618.

> Based on these findings, the UCBR concluded:

> [C]laimant was not suspended until his confrontation with the [M]ayor on February 22, 2016. [C]laimant had locked down the police department premises due to an investigation of alleged fraud by a [B]orough [C]ouncilperson and a police officer. While [C]laimant could have approached the [M]ayor in a different manner, it was not unreasonable for him to protect the integrity of the investigation.

> Therefore, while the [UCBR] in no way questions [E]mployer's right to discharge [C]laimant, it cannot hold that [C]laimant's discharge was for willful misconduct in connection with his work. [C]laimant is eligible for benefits under Section 402(e) of the Law.

UCBR Dec. at 3. We discern no error in the UCBR's reasoning.

> For all of the above reasons, the UCBR's order is affirmed.

_____
ANNE E. COVEY, Judge

Judge Cosgrove concurs in the result only.

13

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Upland Borough,               :
             Petitioner    :
         v.            :
                      :
Unemployment Compensation    :
Board of Review,           :    No. 1548 C.D. 2016
            Respondent   :

## O R D E R

AND NOW, this 12th day of June, 2017, the Unemployment Compensation Board of Review's August 19, 2016 order is affirmed.

_____
ANNE E. COVEY, Judge